2000 SD 83

**Roger STEINKRUGER, Chief Executive Officer, South Dakota Human Services Center, Appellee,**

v.

**DeWayne MILLER, Appellant.**

**No. 21105.**

Supreme Court of South Dakota.

Considered on Briefs Feb. 14, 2000.

Decided June 21, 2000.

---

6. This Court expresses no opinion on any defenses involving the merits which might be

raised on remand.

Mark Barnett, Attorney General, Lynne A. Valenti, Special Assistant Attorney General, Department of Human Services, Pierre, South Dakota, Attorneys for appellee.

David M. Hosmer, Yankton, South Dakota, Kari L. Nordstrom, South Dakota Advocacy Services, Pierre, South Dakota, Attorneys for appellant.

KONENKAMP, Justice

[¶ 1.] Are South Dakota's forced medication statutes unconstitutional because they fail to require that mental patients be given the least restrictive treatment alternative? The circuit court found that there was no less intrusive alternative available in this case. We conclude that our statutes comport with constitutional constraints by incorporating the least restrictive alternative requirement for incompetent, involuntarily committed patients and affirm the circuit court's order for forced medication.

**A.**

[¶ 2.] DeWayne Miller, age fifty-seven, currently resides at the South Dakota Human Services Center as an involuntary patient. He first arrived there in 1979 and returned involuntarily several times. His mental illness has been variously diagnosed as severe schizoaffective disorder, bipolar type, and schizophrenia, paranoid type, continuous, with prominent negative symptoms. Both are classified as psychotic disorders under the DSM–IV, published by the American Psychiatric Association. Miller holds delusions at times that he can read minds, that he is pregnant, that all medicines are poisons. Occasionally, he admits to auditory hallucinations, and his behavior tends to confirm these. He also suffers from chronic obstructive pulmonary disease, diabetes, high blood pressure, renal stenosis, and severe sleep apnea.

[¶ 3.] Dr. Kahn, Miller's treating physician and the medical director at Human Services Center, classifies Miller's chronic and severe mental illness as a danger to himself because while in a delusional state he cannot meet his basic needs for food, clothing, and shelter on his own. Miller's mental health treatment plan includes psychotropic medication, psychotherapy, and participation in life skills and recreation therapy groups. Psychotropics are "[d]rugs with an effect on psychic function, behavior, or experience. . . ." Robert Jean Campbell, M.D., Psychiatric Dictionary 523 (5th ed 1981). Because Miller's mental disorder impairs his judgment and decision-making ability, he denies his illness and refuses both his medicinal and therapeutic regimen. Without psychotropic medication, Dr. Kahn believes, Miller's prognosis remains extremely poor and his current functioning level will decline. Miller's prescribed medication may cause undesirable side effects, such as tiredness and dry mouth, but the drugs can be given in a way to minimize discomfort. Based on his psychiatric and medical opinion, Dr. Kahn concludes that psychotropic medication is the least restrictive treatment available for Miller's condition, and any side effects would be "substantially outweighed" by the expected benefits.

[¶ 4.] Miller perceives no need for medication. One of his delusions is that smoking will cure his pulmonary disease. He denies having any ailments, physical or

mental, and attributes his chronic problems to "stress." When his doctor reviews his proposed treatment with him, including the benefits and adverse effects of the psychotropic medication, Miller consistently refuses consent. According to his treating doctor, however, and as later found by the circuit court, "administration of psychotropic medication is essential and necessary in a meaningful and successful treatment plan [and] although other treatment possibilities exist such as electroconvulsive treatment, psychotropic medication is the treatment of choice considering Mr. Miller's mental and physical conditions." An independent mental status evaluation, requested by Miller's counsel, corroborates these findings and recommendations.

### B.

[¶ 5.] In South Dakota, except in emergencies, involuntarily committed adults may refuse any psychotropic drugs. SDCL 27A–12–3.12; *Rabenberg v. Rigney*, 1999 SD 71, ¶ 12, 597 N.W.2d 424, 426. As a matter of law, these patients are deemed competent to select or reject this medication notwithstanding their involuntary commitment. SDCL 27A–12–1.2. If a patient refuses psychotropic drugs, however, a court may order the medication if it finds by clear and convincing evidence that the patient is incapable of consenting because the patient's "judgment is so affected by mental illness that the [patient] lacks the capacity to make a competent, voluntary, and knowing decision" regarding medication. SDCL 27A–12–3.15. Psychotropic medication may be court ordered only if it is found to be "essential," "medically beneficial," and "necessary" because the patient (1) "presents a danger to himself or others;" (2) "cannot improve or his condition may deteriorate without the medication;" or (3) "may improve without the medication but only at a significantly slower rate." SDCL 27A–12–3.13, –3.15.[1] A court

order for psychotropic drugs may last for no longer than one year and the necessity for treatment with the medication must be medically reviewed every thirty days. SDCL 27A–12–3.16.

[¶ 6.] For each patient, the Human Services Center must develop a "comprehensive individualized treatment program." SDCL 27A–12–3.6. Patients have the right to ongoing participation in the planning of services and treatment, including the right to a reasonable explanation of "[a]ny appropriate and available alternative treatments, services and types of providers of mental health services." SDCL 27A–12–3.6(6). Treatment must "be designed to achieve discharge at the earliest possible time and to maximize each person's development and acquisition of perceptual skills, social skills, self-direction, emotional stability, effective use of time, basic knowledge, vocational occupational skills and social and economic values relevant to the community in which he lives." SDCL 27A–12–3.6.

[¶ 7.] The Chief Executive Officer of the Human Services Center, Roger Steinkruger, petitioned the circuit court for an order to force medicate Miller based on his incompetence to make his own decision. With appointed counsel, Miller moved to dismiss the petition, arguing that South Dakota's forced medication statutes are unconstitutional. After a hearing in which Miller's treating psychiatrist testified, the circuit court denied the motion to dismiss and issued an order to force medicate. The court specifically found that "no less intrusive treatment is currently available" for Miller. Earlier, he had been offered an opportunity to participate in IMPACT (Individualized and Mobile Program of Assertive Community Treatment). He refused, and his medical condition deteriorated to the point that the program was no longer appropriate for him. IMPACT is designed for those with severe and persis-

---

1. SDCL 27A–12–3.13 was amended in 1999, but the changes are not material to this appeal.

tent mental illness. It allows patients to live independently in the community with in-home treatment, rehabilitation, and support.

### C.

■■■ [¶ 8.] On appeal, Miller argues that the forced medication statutes "violate substantive due process," found in the Due Process Clause in Article VI, section 3 of the South Dakota Constitution and the Fourteenth Amendment to the United States Constitution, because there is no statutory requirement that treatment be the least restrictive alternative.[2] Constitutional interpretation is a question of law reviewable de novo. *State v. Beck,* 1996 SD 30, ¶ 6, 545 N.W.2d 811, 812 (citing *Poppen v. Walker,* 520 N.W.2d 238, 241 (S.D.1994)). Statutes are presumed constitutional: challengers bear the burden to prove beyond a reasonable doubt that a statute violates a constitutional provision. *Kyllo v. Panzer,* 535 N.W.2d 896, 898 (S.D. 1995) (citing *Specht v. City of Sioux Falls,* 526 N.W.2d 727, 729 (S.D.1995)). Ordinarily, we review the constitutionality of a statute only when it is necessary to resolve the specific matter before us, and then only to first decide if the statute can be reasonably construed to avoid an unconstitutional interpretation. *City of Chamberlain v. R.E. Lien,* 521 N.W.2d 130, 131 (S.D.1994). The circuit court ruled that the prescribed psychotropic medication was the least restrictive alternative for Miller. Challengers may not assert that a statute is unconstitutional in some unrelated aspect if it is constitutional as applied to them. *State v. Hy Vee Food Stores, Inc.,* 533 N.W.2d 147, 150 (S.D.1995) (citations

omitted). However, as the question is likely to arise again, we will review Miller's claim. *Rabenberg,* 1999 SD 71, ¶ 2 n. 2, 597 N.W.2d at 425 (importance of issue overrides mootness doctrine).

### D.

■■ [¶ 9.] We begin our constitutional analysis by first considering the rights created under our state forced medication statutes. As the United States Supreme Court explained, state law may serve as a source of a federal right to refuse medication independent of any right conferred in the Due Process Clause of the Fourteenth Amendment. *Washington v. Harper,* 494 U.S. 210, 221–22, 110 S.Ct. 1028, 1036, 108 L.Ed.2d 178, 198 (1990) (citations omitted). Our law explicitly grants involuntarily committed patients the right to refuse psychotropic medication. SDCL 27A–12–3.12. Only under exacting standards and by court order may patients be medicated against their will. SDCL 27A–12–3.13, –3.15. When a state enacts a right to refuse psychotropic medication and imposes strict conditions on when patients can be force medicated, the laws create a "justifiable expectation" that "the drugs will not be administered unless those conditions exist." *Harper,* 494 U.S. at 221, 110 S.Ct. at 1036, 108 L.Ed.2d at 198 (citations omitted). Thus a statutory right to refuse prevails in South Dakota, and this right partly delimits the scope of protections under the federal constitution. *Id.* at 220, 110 S.Ct. at 1035, 108 L.Ed.2d at 197 (citing *Mills v. Rogers,* 457 U.S. 291, 299, 102 S.Ct. 2442, 2448, 73 L.Ed.2d 16, 23 (1982)). Yet, also by statute, an incompetent patient's refusal can be overridden.

---

**2.** SDCL 27A–1–1(11) defines "least restrictive treatment alternative" as

the treatment and conditions of treatment which, separately and in combination, are no more intrusive or restrictive of mental, social or physical freedom than necessary to achieve a reasonably adequate therapeutic benefit. In determining the least restrictive alternative, considerations shall include the values and preferences of the patient, the environmental restrictiveness of treat-

ment settings, the duration of treatment, the physical safety of the patient and others, the psychological and physical restrictiveness of treatments, the relative risks and benefits of treatments to the patient, the proximity of the treatment program to the patient's residence, and the availability of family and community resources and support[.]

*Cf. Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984).

We must therefore explore further the right to refuse psychotropic drugs to see if it also has an independent constitutional basis.

[¶ 10.] Over the past two decades, the Supreme Court has progressively scrutinized the rights of the mentally ill. In *Mills*, because an intervening state court ruling required a remand, the Court left undecided whether involuntarily committed mental patients have a constitutional right to refuse treatment with psychotropic drugs. Nonetheless, the Court noted in passing that state law could create an interest in refusing medication. *Mills*, 457 U.S. at 300, 102 S.Ct. at 2449, 73 L.Ed.2d at 23–24. Only a few years later, however, the Court declared that under the Fourteenth Amendment to the United States Constitution, all persons have a protected liberty interest to refuse certain medical treatments. *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278–79, 110 S.Ct. 2841, 2851–52, 111 L.Ed.2d 224, 242 (1990) (patient has liberty interest to refuse life sustaining support in form of artificial hydration and nutrition under Fourteenth Amendment). That same year, in discussing involuntary administration of psychotropic medication, the Court declared, there is "no doubt" mentally ill *prisoners* possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Harper*, 494 U.S. at 221–22, 110 S.Ct. at 1036, 108 L.Ed.2d at 198 (citations omitted) (emphasis added).

[¶ 11.] In *Riggins v. Nevada*, the most recent Supreme Court decision on forced medication with psychotropic drugs, the Court examined a pretrial detainee's right to refuse. 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992). There, the defendant was administered antipsychotic drugs, over his objection, during his criminal trial for murder and robbery. *Id.* at 129, 112 S.Ct. at 1812, 118 L.Ed.2d at 485. Because he intended to offer an insanity defense, Riggins sought permission to stop taking his medication until the end of his trial, but his request was denied. *Id.* at 130, 112 S.Ct. at 1812, 118 L.Ed.2d at 486. Following his conviction and death sentence, the Court granted certiorari to decide if forced administration of antipsychotic medicine during trial violated Riggins' Sixth and Fourteenth Amendment rights. *Id.* at 132, 112 S.Ct. at 1814, 118 L.Ed.2d at 488. The Court quoted *Harper* in again recognizing that the "forcible injection of medication into a nonconsenting person's body ... represents a substantial interference with that person's liberty." *Id.* at 134, 112 S.Ct. at 1814, 118 L.Ed.2d at 488 (quoting *Harper*, 494 U.S. at 229, 110 S.Ct. at 1041, 108 L.Ed.2d at 203). It then observed that Riggins' "liberty interest in freedom from unwanted antipsychotic drugs" had not been acknowledged by the trial court, and concluded that the record did not show that "administration of antipsychotic medication was necessary to accomplish an essential state policy...." *Id.* at 137–38, 112 S.Ct. at 1816–17, 118 L.Ed.2d at 491.

[¶ 12.] Though dealing in the insanity defense and competency to stand trial context and therefore not controlling authority here, *Riggins* furnishes some insight, if only by dicta, into what standards will apply to claims by civilly committed mental patients to a right to refuse psychotropic drug treatment. The Court announced that Riggins' due process rights would "certainly" have been satisfied "if the prosecution had demonstrated and the [trial court] had found that treatment with antipsychotic medication was medically appropriate and, considering *less intrusive alternatives*, essential for the sake of Riggins' own safety or the safety of others." *Id.* at 135, 112 S.Ct. at 1815, 118 L.Ed.2d at 489 (citation omitted) (emphasis added).[3]

---

3. We think it also significant that the *Riggins* Court never cited the *Youngberg* "professional judgment" standard in balancing the interests of the state and the individual refusing psychotropic medications. *Youngberg v. Romeo*, 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73

[¶ 13.] The least restrictive alternative standard is an archetypal component of strict constitutional scrutiny. *See, e.g., Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624, 634 (1981). Yet the *Riggins* Court specifically stated that it was not adopting a strict scrutiny standard. *Riggins*, 504 U.S. at 136, 112 S.Ct. at 1815, 118 L.Ed.2d at 490. The language of the Court's opinion, however, suggests that in the future, beyond the criminal setting, the right to refuse psychotropic drugs will be rigorously construed. The Court in *Harper* specifically rejected a requirement to show a less restrictive alternative, but the *Riggins* decision, handed down after *Harper*, specifically required it. *Harper* dealt primarily with prisoner management in furtherance of "penological interests." *Harper*, 494 U.S. at 223, 110 S.Ct. at 1037, 108 L.Ed.2d at 199 (citing *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261–62, 96 L.Ed.2d 64, 79 (1987)). And while the *Harper* decision rejected a need for a judicial determination to forcibly medicate, the *Riggins* Court mandated that a judge make findings on the necessity for medication. Thus courts are required to find "overriding justification" and medical appropriateness to authorize medicating nonconsenting mentally ill detainees. *Riggins*, 504 U.S. at 135, 112 S.Ct. at 1815, 118 L.Ed.2d at 489. Only safety reasons or "other compelling concerns" outweigh the right to refuse antipsychotic drugs. *Id.* at 136, 112 S.Ct. at 1816, 118 L.Ed.2d at 490.

[¶ 14.] If prisoners and pretrial detainees possess the rights recognized in *Harper* and *Riggins*, how can mental patients not also possess them? Mental illness commitment cannot be equated with imprisonment.[4] On the contrary, civilly committed mental patients are surely entitled to greater therapeutic safeguards. Our statutes prohibit mental patients from being force medicated merely to maintain an orderly milieu or a secure psychiatric ward. SDCL 27A–12–3.13, –3.15. Unlike the inmate in *Harper*, mental patients are not institutionalized for the sake of punishment or societal isolation.

[¶ 15.] Psychotropic drugs intervene in the deepest functions of personhood. They are "mind altering." *Mills*, 457 U.S. at 293 n. 1, 102 S.Ct. at 2445, 73 L.Ed.2d at 19. Defining one's own "concept of existence" rests at the "heart of liberty." *Planned Parenthood v. Casey*, 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674, 698 (1992). "No right is held more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of his own person...." *Union Pacific Ry. Co. v. Botsford*, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734, 737 (1891). Many psychoactive medications cause serious, sometimes permanent, adverse reactions. *See In re C.E.*, 161 Ill.2d 200, 204 Ill.Dec. 121, 641 N.E.2d 345, 352 (1994) and authorities cited therein. Even the temporary "reactions include drowsiness, excitement, restlessness, bizarre dreams, hypertension, nausea, vomiting, loss of appetite, salivation, dry mouth, perspiration, headache, constipation, blurred vision, impotency, eczema, jaundice, tremors, and

---

L.Ed.2d 28, 41. After the *Youngberg* decision, the Court vacated a decision by the Third Circuit that held that a mental patient has a constitutional right to be free from psychotropic treatment, and to protect this liberty interest, a "least intrusive infringement" analysis must be conducted. *See Rennie v. Klein*, 653 F.2d 836, 845 (3rd Cir.1981) [*Rennie I*] *vacated by Rennie v. Klein*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982). *Rennie I* was "remanded for further consideration in light of" *Youngberg*. *Id.* On remand, the Third Circuit recognized that the Supreme Court "declined to adopt a 'least intrusive means' analysis." *Rennie v. Klein*, 720 F.2d 266, 268 (3rd Cir.1983) [*Rennie II*].

4. *See generally* William M. Brooks, *Reevaluating Substantive Due Process as a Source of Protection for Psychiatric Patients to Refuse Drugs*, 31 Ind.L.Rev. 937 (1998); Bruce J. Winick, *New Directions in the Right to Refuse Mental Health Treatment: The Implications of Riggins v. Nevada*, 2 Wm. & Mary Bill Rts.J. 205 (1993).

muscle spasms." *Harper,* 494 U.S. at 240, 110 S.Ct. at 1046, 108 L.Ed.2d at 210 (Stevens, J., concurring). We recognize that pharmaceutical advancements have brought into use new medications with fewer side effects, but adverse reactions have not been eliminated. *See* M.D. Jibson, R. Tandon, 32 J.Psychiatric Res. 215–28 (1998).

■ [¶ 16.] In view of these statutory and juridical considerations, we believe persons involuntarily committed have a federal constitutionally protected liberty interest to refuse the administration of psychotropic drugs.[5] "Constitutional concerns are greatest ... when the State attempts to impose its will by the force of law...." *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 510, 109 S.Ct. 3040, 3052, 106 L.Ed.2d 410, 430 (1989) (quoting *Maher v. Roe,* 432 U.S. 464, 476, 97 S.Ct. 2376, 2383, 53 L.Ed.2d 484, 495–98 (1977)). Other jurisdictions also recognize a substantial liberty interest under the Due Process Clause of the Fourteenth Amendment to refuse psychotropic medication. *See Dautremont v. Broadlawns Hosp.,* 827 F.2d 291 (8th Cir.1987); *Bee,* 744 F.2d 1387; *Johnson v. Silvers,* 742 F.2d 823 (4th Cir.1984); *Project Release v. Prevost,* 722 F.2d 960 (2d Cir.1983); *Rennie II,* 720 F.2d 266; *Woodland v. Angus,* 820 F.Supp. 1497 (D.Utah 1993); *R.A.J. v. Miller,* 590 F.Supp. 1319 (N.D.Tex.1984); *United States v. Leatherman,* 580 F.Supp. 977 (D.D.C.1983); *Davis v. Hubbard,* 506 F.Supp. 915 (N.D.Ohio 1980); *C.E.,* 161 Ill.2d 200, 204 Ill.Dec. 121, 641 N.E.2d 345.

■ [¶ 17.] On the other hand, the right to refuse, though constitutionally based, is not absolute; it must be balanced against state interests. *Youngberg,* 457

U.S. at 319–20, 102 S.Ct. at 2460, 73 L.Ed.2d at 39–40; *Project Release,* 722 F.2d at 979. South Dakota holds a strong parens patriae interest in caring for mentally ill persons and psychotropics retain a vital place in mental health treatment. "Psychotropic medication is widely accepted within the psychiatric community as an extraordinarily effective treatment for both acute and chronic psychoses, particularly schizophrenia." *Harper,* 494 U.S. at 226 n. 9, 110 S.Ct. at 1039, 108 L.Ed.2d at 201 (quoting Brief for American Psychiatric Association as amicus curiae). It would be a cruel forbearance to allow incompetents to reject senselessly the medicine necessary to restore their mental health. "Indeed, use of these drugs has greatly reduced the number of mentally ill requiring hospitalization, and the frequency and length of hospitalizations." *Riese v. St. Mary's Hospital Medical Ctr.,* 209 Cal. App.3d 1303, 271 Cal.Rptr. 199, 203 (1987). Someone must decide for those incapable of consenting when their minds are so affected by mental illness that they lack the capacity to make competent, voluntary, and knowing decisions concerning medication. *Heller v. Doe,* 509 U.S. 312, 332, 113 S.Ct. 2637, 2649, 125 L.Ed.2d 257, 278 (1993) (citations omitted) (state has legitimate interest under its parens patriae powers in providing care to its citizens unable to care for themselves); *C.E.,* 204 Ill.Dec. 121, 641 N.E.2d at 353; *Winters v. Miller,* 446 F.2d 65, 70–71 (2d Cir.1971).

■ [¶ 18.] South Dakota's interest includes protecting both society and the mentally ill from harm when those suffering from serious mental disorders are dangerous to themselves or others. This concern for the incapacitated is embedded in

---

**5.** Although we find it unnecessary to reach the question, we are mindful that state law may recognize more extensive liberty interests than are required by the federal constitution. *Mills,* 457 U.S. at 300, 102 S.Ct. at 2449–50, 73 L.Ed.2d at 23–24 (citing *Greenholtz v. Inmates of Neb. Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2106, 60 L.Ed.2d 668 (1979); *Oregon v. Hass,* 420 U.S. 714,

719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570, 575 (1975)) (other citations omitted). *See also* Michael R. Flaherty, J.D., Annotation, *Nonconsensual Treatment of Involuntarily Committed Mentally Ill Persons with Neuroleptic or Antipsychotic Drugs as Violative of State Constitutional Guaranty,* 74 A.L.R.4th 1099 (1989).

our statutory procedures for administering forced medication. SDCL 27A–12–3.13, – 3.15. Our state law serves as a guide in determining the weight to be given the competing interests of the state and the individual. *Mills,* 457 U.S. at 304, 102 S.Ct. at 2451, 73 L.Ed.2d at 26. For the mentally ill, South Dakota maintains a twofold protective process: First, our law prohibits involuntary commitment of mentally ill persons unless they (1) suffer from severe mental illness, (2) present a danger to themselves or others, and (3) need and will likely benefit from treatment. SDCL 27A–1–2. Second, our forcible medication statutes are narrowly designed to address only those not competent to choose whether to take psychotropic medication. *See* Dennis E. Cichon, *The Potential Impact of Harper v. Washington on South Dakota's Statutory Right to Refuse Psychiatric Treatment,* 36 S.D.L.Rev. 478 (1991).[6] Other states have likewise recognized and upheld similar, narrowly designed statutory schemes to further mental health treatment through forced medication. *See C.E.,* 204 Ill.Dec. 121, 641 N.E.2d at 353– 54; Opinion of the Justices, 123 N.H. 554, 465 A.2d 484, 490–91 (1983); *In re Guardianship of Roe,* 383 Mass. 415, 421 N.E.2d 40, 42 (1981).

[¶ 19.] Although South Dakota has an overriding interest in assisting mentally ill patients unable to decide medication issues for themselves, the need for medication will not automatically allow it to be forcibly administered. As forced medication intrudes on a patient's basic rights, due process requires that psychotropic drugs not only be deemed medically appropriate, but before approving their forced administration the court must also consider "less intrusive alternatives." *Riggins,*

504 U.S. at 135, 112 S.Ct. at 1815, 118 L.Ed.2d at 489. In *Shelton v. Tucker,* 364 U.S. 479, 488, 81 S.Ct. 247, 252 5 L.Ed.2d 231, 237 (1960), the Supreme Court explained that "even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgment must be viewed in the light of less drastic means for achieving the same basic purpose." (Footnotes omitted.) The least restrictive alternative must therefore be an integral part of a court's decision to force medicate. *See also Rennie I,* 653 F.2d at 846–47 ("It appears that at least thirty-five jurisdictions explicitly or implicitly acknowledge the least restrictive doctrine in their statutes as applicable to treatment or involuntary commitment."). Because we find that the right to refuse treatment and the requirement of least intrusive alternative are constitutionally based, we must decide if our statutes are constitutional.

**E.**

[¶ 20.] Miller contends the statutory guidelines for forced medication of an involuntarily committed person are facially unconstitutional because they fail to require that treatment be the least restrictive alternative. "If a statute can be construed so as not to violate the constitution, that construction must be adopted." *Cary v. City of Rapid City,* 1997 SD 18, ¶ 10, 559 N.W.2d 891, 893 (citation omitted).

[¶ 21.] South Dakota law does not explicitly recite the "least restrictive treatment alternative" standard in authorizing forced administration of psychotropic medication. At least the phrase does not expressly

---

6. The South Dakota Legislature's leadership in this area should not go unnoticed. As Professor Cichon wrote:

As the victims of fear, insensitivity, unawareness and paternalism, the mentally ill have long been denied many important legal, social and economic rights. The South Dakota Legislature's recent recognition that

these individuals are not *per se* incompetent, dangerous or helpless was long overdue. These citizens are finally being accorded the right of self-determination in medical matters which profoundly affect the mind and body.

Cichon, *supra,* at 498.

**600**

appear in the language of SDCL 27A–12–3.13 and 3.15. Nonetheless, we find it notable that in enumerating the rights of voluntary and involuntary patients to an individual treatment program, SDCL 27A–12–3.6(6) requires that patients be advised of "[a]ny appropriate and available alternative treatments, services and types of providers of mental health services." If patients deemed competent to participate in deciding their treatment programs must be told of alternative treatments, then it follows that a court making a decision for an incompetent patient must also be advised of these alternatives.

[¶ 22.] In deciding whether to order psychotropic medication, a court must find by clear and convincing evidence that the treatment is "medically beneficial," "necessary," and "essential" under one or more of the three criteria in SDCL 27A–12–3.13. We interpret the term "medically beneficial" to mean that the benefits of psychotropic medication must outweigh its detriments. Adhering to the limitations of SDCL 27A–12–3.13 and 3.15 necessitates a finding that less intrusive treatments will not suffice to meet the patient's individual treatment plan goals required in SDCL 27A–12–3.6; otherwise, more intrusive treatment with psychotropic medication would not be "essential" or "necessary." *See Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905, 910 (1976) (equating "necessary and reasonable" with "the least intrusive" in light of alternative means). Thus, although not recited verbatim in the sections dealing with forced medication, the statutes, by their terms, require these considerations before psychotropic medication may be administered. Therefore, South Dakota's statutory scheme for involuntary medication comports with the requirements of the Due Process Clause of the Fourteenth Amendment. *See Harper,* 494 U.S. at 221–22, 110 S.Ct. at 1036, 108 L.Ed.2d at 198 (citations omitted).

[¶ 23.] Affirmed.

[¶ 24.] MILLER, Chief Justice, and SABERS, AMUNDSON, and GILBERTSON, Justices, concur.